**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| WORLDWIDE AUTO REPAIR LTD, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v . | ) | |
| CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES PLC; NOKIAN TYRES INC; NOKIAN TYRES U.S. OPERATIONS LLC; THE GOODYEAR TIRE & RUBBER COMPANY; PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; BRIDGESTONE CORPORATION; and BRIDGESTONE AMERICAS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. _____  **CLASS ACTION COMPLAINT WITH JURY DEMAND** |
| *Defendants.* | ) ) | |

Plaintiff  Worldwide Auto Repair Ltd. complains upon knowledge, as to itself and its own actions, and upon information and belief, as to all other matters, against Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale des Établissements; Michelin North America, Inc.; Nokian Tyres plc; Nokian Tyres Inc; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.p.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc. for violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and violations of various state antitrust laws.

## I.  INTRODUCTION

1.     This action arises from a *per se* unlawful agreement between Defendants—some of the largest tire manufacturers in the United States and the world—to artificially increase and fix the prices of new replacement tires for passenger cars, vans, trucks, buses, and motorcycles ("Tires") sold in the United States.

2.     On January 30, 2024, the European Commission ("EC") announced raids at the premises of "companies active in the tyres industry in several Member States." The EC justified its dawn raids over suspicion that these companies "violated EU antitrust rules that prohibit cartels and restrictive business practices," specifically that price coordination took place among these companies.

3.     Defendants' unlawful agreement to fix prices of Tires is supported by, among other things: (i) Defendants' sudden and dramatic parallel price increases, which, absent a conspiracy to fix prices, ran contrary to their economic interests; (ii) EC raids of Defendants; (iii) the high level of market concentration in the Tires market; (iv) significant barriers to entry; (v) lack of economic substitutes for Tires; (vi) standardization of Tires with a high degree of interchangeability; and (vii) the many opportunities that Defendants' employees had to conspire with one another to fix prices of Tires, coupled with their motivation to achieve an unlawful end.

4.     Plaintiff seeks to represent a Class of individuals and entities that purchased Tires indirectly from one or more of the Defendants at supracompetitive prices for resale.

5. Plaintiff seeks injunctive relief, and other relief as is appropriate, including damages, based on Defendants' violations of federal and state antitrust laws.

6. Plaintiff demands a trial by jury.

## II. PARTIES

### A. PLAINTIFF

7. Plaintiff purchased Tires manufactured by one or more of Defendants within the State of New York during the Class Period defined below, and suffered antitrust injury because of the violations alleged in this complaint.

### B. DEFENDANTS

### Continental Defendants

8. **Defendant Continental Aktiengesellschaft** ("Continental AG") is a German company with its headquarters at Vahrenwalder Strasse 9, 30165 Hannover, Germany. Continental AG is divided into four group sectors: Automotive, Tires, ContiTech, and Contract Manufacturing. The Tires group has five business areas :(i) Original Equipment, (ii) Replacement APAC, (iii) Replacement EMEA, (iv) Replacement the Americas, and (iv) Specialty Tires.

9. In its 2022 Annual Report, Continental AG reported that its "Tires group sector achieved a particularly positive result, even surpassing expectations with an adjusted EBIT margin of 13.1 percent." In 2022, Continental AG reported sales of €14 billion globally for its tire group. Continental AG's tire group boasts 56,987 employees worldwide.

10. For the Tires group sector, economies of scale are important drivers of profitability. For that reason, "manufacturing takes place at major locations in the dominant automotive markets, namely Europe, the USA and China."

11. **Defendant Continental Tire the Americas, LLC** ("Continental U.S.") is a limited liability company incorporated under Ohio law, with its principal place of business at 1830 MacMillian Park Drive, Fort Mill, SC 29707. Continental U.S. "manufactures and distributes a complete premium line of passenger, light truck and commercial tires for original equipment and replacement markets." Continental US sells its tires through "independent tire dealers, car dealers, and mass retail companies across North America." Continental U.S. has manufacturing facilities in Barnseville, Georgia (Tire Cord [textile]), Mt. Vernon, Illinois (Passenger/light truck/Commercial truck tires), Sumter, South Carolina (passenger/light truck tires), and Jackson, Missouri (commercial truck tires).

12. Continental U.S.'s headquarters in Fort Mill, SC is the "operational hub for business in the region and oversees all tire product lines including passenger, light truck, commercial, two wheel and specialty tires." The facility has 500+ employees and includes teams for Engineering & Technology, Sales & Marketing, and Central Functions.

13. Continental U.S.'s Sumter Plant is "a tire manufacturing facility [that] produces high-quality, premium lines of passenger and light truck tires for original equipment and replacement markets." It has a "State of the Art manufacturing facility with a growing team of more than 1200 employees."

**Michelin Defendants**

14.     **Defendant Compagnie Générale des Établissements** ("CGEM") is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries. CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly owned subsidiary that coordinates all of the Group's manufacturing, sales and research operations in France and Compagnie Financière Michelin, a wholly owned subsidiary that owns most of the Group's manufacturing, sales and research companies outside of France and coordinates their operations.

15.     **Defendant Michelin North America, Inc**. is a corporation organized under New York law with its principal place of business at One Parkway South, Greenville, SC 29615-5022. Michelin designs, manufactures, and sells tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers, farm equipment, heavy-duty trucks, and motorcycles.

16.     Michelin is one of the leading manufacturers of tires in the United States. In 2022, Michelin had €10.92 billion in sales North America, 80% of which were generated in the United States. Michelin employs 23,000 people across 34 plants in the United States and Canada. Michelin has manufacturing facilities in, among others, Alabama (light trucks and passenger tires), Indiana (car tires), Oklahoma (passenger tires), and South Carolina (passenger tires and truck and bus tires).

**Nokian Tyres Defendants**

17.    **Defendant Nokian Tyres plc** is organized under the laws of Finland with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide. Nokian Tyres plc develops and manufactures tires for passenger cars, trucks, and heavy machinery. In 2019, the company's net sales were $1.8 billion, and it employed some 4,700 people.

18.    **Defendant Nokian Tyres Inc.** is a corporation organized under Delaware law. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc. In December 2018, Nokia Tyres announced its new headquarters located at 501 Union Street in Nashville, Tennessee, which would house Nokia Tyres' Vice President along with members of the company's sales, customer service, IT, logistics, finance, and marketing teams.

19.    In 2019, Nokian Tyres announced it had opened a $360 million manufacturing facility located at 520 Nokian Tyres Dr., Dayton, TN, 37321. The manufacturing facility produces car and light truck all season tires and all-weather tires for consumers in the United States and Canada.

20.    **Defendant Nokian Tyres U.S. Operations LLC** is a limited liability company organized under Tennessee law. It is a subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

**Goodyear Defendant**

21.     **Defendant The Goodyear Tire & Rubber Company** is a corporation organized under Ohio law with its principal place of business in this District at 200 Innovation Way Akron, Ohio 44316-0001.

22.     Goodyear is one of the world's leading tire companies, with one of the most recognizable brand names. It develops, manufactures, markets, distributes tires for most applications, manufactures, and markets rubber-related chemicals for various uses.

23.     Through its worldwide network of aligned dealers and wholesale distributors and its own retail outlets and commercial truck centers, Goodyear offers its products for sale to consumers and customers, along with repair and other services.

24.     Goodyear manufactures its products in 57 facilities in 23 countries and has operations in most regions of the world.

25.     Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft and Roadmaster brands.

26.     Approximately 86% of Goodyear's sales in 2022, 85% in 2021 and 84% in 2020 were for tire units.

27.     The principal means for the sale of Goodyear and Cooper brand tires in the U.S. is a large network of independent dealers.

28.     Goodyear, Cooper, Dunlop, Kelly and Mastercraft brand tires are also sold to numerous national and regional retailers, in Goodyear Company-owned stores in the United States, and through the wholesalers.

**Pirelli Defendants**

29.      **Defendant Pirelli & C. S.p.A.** is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli designs, manufactures, and distributes tires for cars, motorcycles, and bicycles.

30.      Pirelli focuses its business on the high end, premium product segment where it is a world leader.

31.      Pirelli has a commercial presence in over 160 countries and 19 manufacturing sites in 12 countries.

32.      **Defendant Pirelli Tire LLC** is a foreign limited liability company organized under Delaware law with its principal place of business located at 100 Pirelli Drive Rome, GA 30161.

33.      Pirelli Tire LLC includes the Modular Integrated Robotized System (MIRS) facility and research and development center at its Rome, Georgia headquarters, a state-of-the-art manufacturing plant in Silao, Mexico, sales and marketing offices in New York City, Los Angeles, Detroit, Montreal and Atlanta, and a prestige flagship store in Los Angeles for export and domestic car/motorcycle applications.

**Bridgestone Defendants**

34.      **Defendant Bridgestone Corporation** is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all Group companies, including Bridgestone

8

Americas, defined below, ("BSAM"), Bridgestone China, Asia Pacific, Bridgestone Europe, Russia, Middle East, India, and Africa, and Bridgestone Japan.

35.    Bridgestone Corporation is the world's largest tire and rubber company.

36.    **Defendant Bridgestone Americas, Inc.** ("BSAM") is incorporated under Nevada law with its principal place of business at 200 4th Ave, Suite 100, Nashville, Tennessee, 37201-2256.

37.    BSAM and its subsidiaries develop, manufacture, and market a wide range of Bridgestone, Firestone, and associate brand tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries.

38.    BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.

39.    BSAM also owns Firestone Tire and Rubber Company.

### III.   AGENTS AND CO-CONSPIRATORS

40.    The anticompetitive and unlawful acts alleged in this Complaint were authorized, ordered, or performed by Defendants' officers, agents, employees, or representatives, while engaged in the management, direction, or control of Defendants' businesses or affairs.

41.    Each corporate Defendant's agents operated under the authority and apparent authority of its principals.

42.    Each corporate Defendant, through its subsidiaries, affiliates, and agents, operated as a single unified entity.

9

43.     Various persons and/or firms not named as Defendants have participated as co-conspirators in the violations alleged here and may have performed acts and made statements in furtherance of the conspiracy.

44.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged.

45.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Furthermore, if subsidiaries within corporate families distributed the Tire products, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements.

46.     Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices

### IV.   JURISDICTION AND VENUE

47.     The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

48.     The Court has jurisdiction over Plaintiff's claim for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

49.     This Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had

substantial contacts with this jurisdiction, and because Plaintiff's claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction.

50.     Venue is proper in this district under 28 U.S.C. §§ 1391(b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22.

51.     During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue here occurred in this District.

52.     Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

53.     During the Class Period, Defendants manufactured, sold, and shipped Tires in a continuous and uninterrupted flow of interstate commerce, which included sales of Tires in this District, advertisement of Tires in media in this District, and employment of sales personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

54.     On June 7, 2024, the United States Judicial Panel on Multidistrict Litigation issued a Transfer Order centralizing thirteen Tire-related litigations to this Court. (MDL Case No. 3107).

## V. FACTUAL ALLEGATIONS

### A. The Tires Market

55. Virtually all land vehicles, whether off-road or on-road, use Tires. This dependence makes the tire industry a critical component of the U.S. automobile industry.

56. With nearly 9.2 million passenger and commercial vehicles being produced and almost 14 million vehicles being sold in the United States in 2022, the U.S. market calls for a large number of tires to be manufactured annually.

57. Given the critical need for tires in all wheeled land vehicles, automobile tire manufacturers have existed in the United States as long as there have been cars. For example, Defendant Goodyear began producing automobile tires in 1899.

58. U.S. tire manufacturing has an annual economic impact of $170.6 billion.

59. The United States Tire Manufacturers Association ("USTMA") projects total U.S. tire shipments of 334.2 million units in 2023, compared to 332.0 million units in 2022 and 332.7 million units in 2019.

60. The market for replacement tires in the United States was approximately $61 billion in 2022.

61. Tires either can be on new cars ("Original Equipment Tires" or "OE" tires) or produced as replacement tires ("Dedicated Replacement Tires").

62. There are differences between OE tires and Dedicated Replacement Tires.

63.     OE tires are specified by the vehicle manufacturer and are initially fitted to the vehicle when new.

64.     Dedicated Replacement Tires are selected by individual consumers.

**B.    Tire Prices in the United States increased dramatically after long periods of stable pricing.**

65.     For most of the 2010s, the price level of Tires was stable, changing only by small amounts slowly.

66.     Over the last four years, the prices of Tires have seen dramatic increases, driven by lock-step prices increases from the major U.S. Tire manufacturers.

67.     The Federal Reserve Economic Data (FRED) show a spike in the producer price index by industry for tire manufacturing (except retreading) for pneumatic tires (which includes passenger, truck, bus, tractor, industrial, and other tires).

**Table 1 Trends**



68.    The following table summarizes Defendants' price increases on passenger and light truck replacement tires between 2021 and 2023:

**Table 2: Defendants' Prices Increases During the Class Period**

| Defendant | Effective Date | Price Increase |
|---|---|---|
| Michelin | February 1, 2021 | Up to 5% |
| Continental | March 1, 2021 | Undisclosed |
| Michelin | April 1, 2021 | Up to 8% |
| Goodyear | April 1, 2021 | Up to 8% |
| Pirelli | April 15, 2021 | Up to 7% |
| Bridgestone | May 1, 2021 | Up to 8% |
| Goodyear | June 1, 2021 | Up to 8% |
| Michelin | July 1, 2021 | Up to 6% |
| Continental | July 1, 2021 | Undisclosed |
| Pirelli | July 1, 2021 | Up to 6% |
| Goodyear | September 1, 2021 | Up to 8% |
| Michelin | September 1, 2021 | Up to 14% |
| Continental | October 1, 2021 | Undisclosed |
| Pirelli | October 1, 2021 | Up to 8% |
| Michelin | January 1, 2022 | Up to 12% |
| Goodyear | January 1, 2022 | Up to 12% |
| Continental | January 3, 2022 | Undisclosed |
| Pirelli | January 17, 2022 | Up to 10% |
| Continental | April 1, 2022 | Undisclosed |
| Michelin | April 1, 2022 | Up to 5% |
| Bridgestone | April 1, 2022 | Up to 10% |
| Pirelli | April 11, 2022 | Up to 10% |
| Continental | June 1, 2022 | Undisclosed |
| Michelin | June 1, 2022 | 5-12% |
| Pirelli | June 15, 2022 | Up to 10% |
| Goodyear | July 1, 2022 | Up to 10% |
| Bridgestone | July 1, 2022 | Up to 10% |
| Bridgestone | October 1, 2022 | Up to 9% |
| Michelin | January 1, 2023 | Up to 9% |
| Bridgestone | January 1, 2023 | Undisclosed |
| Pirelli | January 15, 2023 | Up 10% |

69. On February 1, 2021, Michelin increased prices on select Michelin and BFGoodrich brand passenger and light truck tires, as well as on select commercial truck tires, up to 5% "due to changing business dynamics of the U.S. market."

70. On March 1, 2021, Continental increased prices on select passenger and light truck tires in the U.S. within the Continental and General brands by an undisclosed amount.

71. On April 1, 2021, Michelin and Goodyear both increased prices on tires. Michelin increased prices on select Michelin, BFGoodrich and Uniroyal passenger and light truck tires up to 8%, citing "changing business dynamics and rising costs of raw materials." Goodyear raised prices of its Goodyear, Dunlop, and Kelly-brand consumer tires by up to 8%.

72. On 15, 2021, Pirelli increased prices on passenger and light truck tires in the United States up to 7%, citing "higher price of raw materials and changing market conditions.

73. On May 1, 2021, Bridgestone increased prices on select Bridgestone and Firestone brand passenger and light truck tires up to 8% in the United States and Canada due to "increased business costs and other market dynamics."

74. On June 1, 2021, Goodyear increased prices on Goodyear, Dunlop, and Kelly consumer tires by up to 8%. Goodyear blamed the increase on "changing market dynamics in the industry and [a] reflect[ion of] the strong value of the Goodyear brands"—using identical wording from its April 1, 2021 price increase.

75.     On July 1, 2021, Michelin, Continental, and Pirelli implemented price increases on tires. Michelin increased prices on certain aftermarket Michelin, BFGoodrich, and Uniroyal passenger and light truck tires by up to 6%. Continental increased prices on select Continental and General brand passenger and light truck tires by an undisclosed amount. Pirelli increased prices of passenger and light truck tires by up to 6%, citing higher price of raw materials and changing market conditions.

76.     On September 1, 2021, Michelin and Goodyear implemented price increases on consumer tires. Michelin increased prices on certain aftermarket Michelin, BFGoodrich, and Uniroyal passenger and light truck tires by up to 14%. Goodyear increased prices on passenger and light truck tires by up to 8%.

77.     On October 1, 2021, Continental and Pirelli increased prices on tires. Continental increased prices on some Continental and General passenger and light truck tires by an undisclosed amount.

78.     Pirelli increased prices on car and light truck tires by up to 8%, citing higher prices of raw materials and changing market conditions.

79.     On January 1, 2022, Defendant Michelin implemented price increases up to 12% on select Michelin, BFGoodrich, and Uniroyal passenger and light truck replacement tires. Similarly, Goodyear raised its prices on consumer tires by up to 12%.

80.     On January 3, 2022, Continental increased prices on select Continental and General passenger and light truck tires by an undisclosed amount.

81.     On January 17, 2022, Pirelli increased its prices for car and light truck tires by up to 10%.

82.     On April 1, 2022, Defendant Continental, Michelin, and Bridgestone increased tire prices. Continental increased its price on select Continental passenger and light trucks by an amount that varied across specific products by brand. Michelin increased prices by 5% on the majority of select passenger and light truck replacement tires. Bridgestone increased prices by up to 10% on non-winter Bridgestone, Firestone, and Fuzion passenger and light truck replacement tires.

83.     On April 11, 2022, Pirelli increased its prices by up to 10%.

84.     On June 1, 2022, Defendants Continental and Michelin each increased prices on tires. Continental increased its prices on Continental- and General-branded passenger and light truck tires by an undisclosed amount. Michelin increased prices on the majority of its passenger and light truck replacement tires ranging from 5–12%.

85.     On June 15, 2022, Pirelli increased its prices for car and light truck tires by up to 10%.

86.     On July 1, 2022, Goodyear and Bridgestone each increased prices by up to 10% on consumer tires.

87.     On October 1, 2022, Bridgestone again increased its prices on Bridgestone, Firestone, and Fuzion passenger and light truck tires by up to 9%.

88.     On January 1, 2023, Michelin and Bridgestone each increased their tire prices. Michelin increased prices on select passenger and light trucks tires up to 9%.

Bridgestone increased its prices on passenger and light truck replacement tires by an undisclosed amount.

89.     On January 15, 2023, Pirelli increased its prices for car and light truck tires by up to 10%.

90.     Between 2021 and 2023, the average price of Tires rose 21.4%, a rate of increase more than 70% higher than inflation.

91.     Prices for Tires have remained high despite easing inflation and dissipating effects of the COVID-19 pandemic.

92.     Defendants' price increases are also disproportionate to their increased costs during the pandemic. For example, in its Q1 2022 earnings call on May 6, 2022, Goodyear's Chief Financial Officer, Darren Wells, told investors "[Goodyear's] increase in the replacement tire prices more than offset [its] costs."

93.     Sales volume also did not suffer due to price increases, which would normally be seen in a price-competitive market. For example, Continental's sales volume rose by 19.3% in 2022. Their annual report from that year states, "agreements reached with customers on price adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."

## C.     Defendants' Participation in the Tires Market

94.     Defendants are the largest tire manufacturers in the world.

95.     Bridgestone is the world's largest tire and rubber manufacturer, with about 130 manufacturing plants and R&D facilities in 25 countries and sells products in more than 150 countries worldwide. Michelin has nine R&D centers around the

world, 123 production sites in 26 countries, a commercial presence in 170 countries and 125,000 employees worldwide, and does business on every continent.

96.     Goodyear employs about 712,000 people and manufactures its products in 55 facilities in 22 countries around the world. Pirelli has 18 factories located in 12 countries, production capacity in 2022 of 74 million car tires, and points of sale in over 160 countries (around 20,000 in 2022).

97.     Continental employs almost 200,000 people at 519 locations for production, research, and development, and is present in 57 countries and markets. It has 917 company-owned tire outlets and a total of around 5,228 franchises and operations with a Continental brand.

98.     The U.S. Tires market is oligopolistic, with three of Defendants controlling nearly all the market: in 2022, Defendants Bridgestone, Michelin, and Goodyear made up almost 64 percent of the entire replacement tire market. Each of the Big Three also encompasses subsidiary brands: (i) Goodyear: Goodyear, Cooper Tires, Dunlop, and Kelly, (ii) Michelin: Michelin, BF Goodrich, and Uniroyal, (iii) Bridgestone: Bridgestone and Firestone. The remaining 35 percent of the market includes manufacturers such as Continental and Nokian.



**Figure 3.**

99.    This concentration makes the Tires market more susceptible to cartelization.

100.   A smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, to allocate market shares, to conceal their collusion, to develop enforcement mechanisms, and to detect and punish cheaters.

**D.    Factors corroborating Defendants' horizontal price-fixing agreement.**

101.   In addition to lock-step price increases, an EC investigation, and a consolidated industry susceptible to collusion, Defendants' unlawful agreement to fix prices of Tires is supported by (i) motive and (ii) opportunity, in a market with (iii) high barriers to entry, (iv) price inelasticity, and (v) interchangeable products. Defendants are also recidivist bad actors.

**Motive**

102.   The rising number of total vehicle miles in the United States and the low price of rubber created healthy operating conditions for tire manufacturers leading up to the outbreak of COVID-19.

20

103.    However, as measures were put into place to combat the spread of the virus, domestic travel stopped and then slowed, reducing demand for tires. In addition, the supply chain struggled even after the COVID-19 pandemic subsided, causing a lasting effect that increased the costs related to logistics and raw materials. This caused profit to shrink as revenue dried up while costs of goods sold skyrocketed.

104.    To remain profitable, Defendants needed to pass on these costs to consumers.

105.    By 2023, inflation had eased, and supply chain logistics had recovered, but Tire prices remained high, despite excess supply.

106.    In a normal functioning economy, as costs lowered and there was excess supply, prices would lower too, as inflated prices would lead to a loss of market share. Yet prices remain high, as noted above.

### Opportunity

107.    Defendants had opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy.

108.    Throughout the Class Period, the Tire industry provided many opportunities for Defendants and/or their parent companies to collude and fix the prices of Tires, through trade association meetings and public communications.

109.    Each of the Defendants is a member of the U.S. Tire Manufacturers Association ("USTMA"), a national trade association for tire manufacturers that produce tires in the United States.

110.    Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA.

111.    USTMA holds a number of annual conferences and meetings where Defendants had the opportunity to meet and discuss pricing.

112.    Defendants also closely monitored their conspiracy by tracking the other cartel member's pricing and sales information.

113.    The monitoring of the pricing and other conduct of co-conspirators is a common tactic for price fixing cartels. Revenue-management software enables them to use large data sets that include competitor pricing data to maximize revenues.

114.    Revenue-management software allows Defendants to analyze and filter large data sets of pricing information at a granular level and then develop pricing strategies informed by market trends. The programs also allow for close monitoring of competitors' pricing.

115.    One revenue-management software is sold by Torqata Data and Analytics ("Torqata"), formerly an analytic division of American Tire Distributors, which was spun off in 2020.

116.    Torqata produces revenue-management software specific to the tire industry so that manufacturers, distributors, and retailers can use data-driven analytics to quickly respond to market trends and increase revenue. Its Pricing Insights feature allows customers to use an analysis of competitors' private information to maximize revenue.

117.    Lizeo Group's Retail Price Pro software, which is purchased by Bridgestone and Continental, also gives access to granularized pricing data from competitor manufacturers. Customers can set a pricing strategy informed by this pricing data

## Barriers to Entry

118.    Tire manufacturers face significant entry and exit barriers that lead to market concentration, which facilitates collusion.

119.    Barriers to entry include large capital investments to establish manufacturing plants that can produce tires at scale. For example, Defendant Nokian recently completed a $360 million manufacturing facility in Dayton, Tennessee.

120.    Established tire manufacturers have also erected significant intellectual property protections through patented products.

121.    As to exit barriers, because a huge amount of investment is required to set up a manufacturing plant and to shift to new business, it is extremely difficult to exit from the tire industry. For example, Uniroyal and Goodrich had to merge due to high exit barriers. Thus, consolidation is more likely than companies going out of business.

122.    Because the Tires market has high barriers to entry, it is more conducive to collusion.

123.    To maximize long-term profits, the cartel-fixed price must be high enough to warrant participation in a criminal conspiracy but not so high as to lure new competitors into the market.

124.    When high barriers to entry protect a market, conspirators are better able to fix a high price with less concern that new firms will enter the market and bid the prices down.

**Price inelasticity for Tires makes the market susceptible to collusion.**

125.    When a seller of goods or services can increase selling price without suffering a substantial reduction in demand, pricing is considered inelastic.

126.    Demand elasticity affects whether price fixing is likely to be profitable.

127.    When demand is inelastic, a seller with market power can charge a higher price without losing significant sales. This market characteristic encourages collusion because rivals can collectively raise price profitably.

128.    Tires are highly inelastic because tire replacement is not an option that can be deferred for long, particularly when a tire is damaged.

129.    Tires do not compete with other products; consequently, there is no inter-industry competition through cross-elasticities of demand. Because the demand for Tires derives from the need to use the automobile, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

130.    Because the price for Tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, BSAM's chief operating officer reported, "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."

**Tires are standardized products with a high degree of interchangeability.**

131.    Defendants make similar models of Tires (all-season, all-terrain, winter/snow, and summer tires).

132.    Within each type-category, Tires do not differ significantly in quality, appearance, or use. As a result, Tire models are functionally interchangeable.

133.    When purchasing replacement tires, consumers can choose almost any brand on the market.

134.    Even when consumers are replacing only some of the four tires, they can use tires from different brands or models so long as certain features, such as tread depth, are similar. Thus, Tire "producers are not likely to be able to deviate much from the competitive price without losing sales."

135.    When products are interchangeable, the primary way to compete is because of price.

136.    The avoidance of price-based competition is the primary motivation for forming a cartel.

137.    Thus, cartels are more likely when the participants sell interchangeable products.

138.    Where a product like a Tire is interchangeable, economics suggests that cartel behavior is facilitated because, among other things, cartel members can more easily monitor and detect defections from a price-fixing agreement.

**Defendants are recidivist violators of antitrust laws.**

139.    The U.S. Tire industry for years has been highly concentrated, and there is a history of antitrust violations by Tire manufacturers.

25

140. In 2001, the EC fined Michelin nearly €20 million "for abusing its dominant position in replacement tyres for heavy vehicles in France during most of the 90s."

141. In 2008, the South African Competition Authority conducted search and seizure operations at the premises of Bridgestone, Dunlop, and the South African Tyre Manufacturers' Conference ("SATMC").

142. These raids resulted in South African's competition authority issuing fines against Goodyear and Continental, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator.

143. In 2019, Bridgestone and Continental were among the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.

### Defendants' Conspiracy

144. On January 30, 2024, the EC said in a press statement that is carrying out inspections at the premises of various tire manufacturing companies in Member States related to suspected anticompetitive practices.

145. The EC stated that it suspects "price coordination took place amongst the inspected companies," constituting a secret cartel to fix the prices of "new replacement t[i]res for passenger cars, vans, trucks and buses."

146. The EC Antitrust Division is running its investigation in partnership with its counterparts from the relevant national competition authorities of the

Member States where the inspections were carried out, which would include France, Belgium, Germany, Italy, and Finland.

147.    The six industry giants confirmed that they were under investigation and were cooperating with the various competition authorities.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

148.    Plaintiff and the Class did not know and could not have known of Defendants' illegal conduct until the EC announced raids in the tire industry on January 30, 2024.

149.    Before then, Plaintiff and the Class had no reason to believe that they paid prices for Tires that were affected by Defendants' illegal conduct, and thus, had no duty until then to investigate the claims set forth in this Complaint.

150.    Defendants' secret price-fixing agreements were self-concealing.

151.    Defendants also engaged in acts designed to mislead and conceal their illegal conduct.

152.    For example, Michelin attributed its 12% price increase on light truck replacement tires in 2022 due to "market dynamics."

153.    Goodyear explained its July 1, 2022 price increase on consumer tires to rising raw materials and other inflation-impacted costs.

154.    Pirelli justified its April 11, 2022 price increase to "changing market conditions."

155.    Accordingly, if tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statutes of limitations governing

claims under the Sherman Act were tolled at least until January 30, 2024, under the injury-discovery rule and the doctrine of fraudulent concealment.

## VII.   CLASS ACTION ALLEGATIONS

156.   Under Federal Rules of Civil Procedure 23(b)(2) and (3), Plaintiff brings this suit on its behalf and on behalf of two proposed classes of all other similarly situated persons consisting of:

**Nationwide Injunctive Relief Class** (the "Injunction Class")

All persons or entities who indirectly purchased Tires for resale manufactured by any Defendant within a state or territory of the United States of America from January 1, 2020 until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

**Indirect Purchaser Reseller Class** (the "Reseller Class")

All residents or citizens of a state or territory of the United States of America whose laws permit an indirect purchaser to pursue a claim for anticompetitive conduct who indirectly purchased Tires manufactured by any Defendant during the Class Period.

Excluded from each Class are: (a) the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates; (b) any entity in which a Defendant has a controlling interest; (c) any divisions, subsidiaries, and predecessors of a Defendant; (d) all governmental entities; (e) the judges in this case and any members of their immediate families and judicial staff; (f) any juror assigned to this action; (g) all persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (h) and all persons who are currently incarcerated.

157.   Each Class consists of thousands of members residing throughout the United States. Thus, it would be impracticable to join all "Class Members" before the Court.

158.   Plaintiff's claims are typical of the claims of the Class Members, in that they share the facts above and legal claims or questions with the Class Members,

there is a sufficient relationship between the damage to Plaintiff and the Classes and Defendants' conduct affecting Class Members,

159.    Plaintiff has no interests adverse to the interests of other Class Members.

160.    Under Rule 23(b)(3), there are numerous questions of law or fact common to all the members of the Classes and which predominate over any individual issues.

161.    Included within the common question of law or fact are:

    a.    The definition of the relevant product markets;

    b.    Defendants' market power within the relevant product markets;

    c.    Whether Defendants contracted, combined, or conspired with one another to restrain trade of Tires at any time during the Class Period;

    d.    Whether Defendants' conduct caused the prices of Tires sold to resellers to be higher than the competitive level as a result of their restraint of trade (supracompetitive prices);

    e.    Whether Plaintiff and the other Class Members were injured by Defendants' conduct;

    f.    The quantum of overcharges paid by the Class in the aggregate; and

    g.    Whether Plaintiff and Class Members are entitled to, among other things, injunctive relief and the nature and extent of such relief.

162.    Plaintiff will fairly and adequately protect the interests of each Class Member.

163. Plaintiff has retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in antitrust litigation.

164. A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable, and no other group method of adjudication of all the claims asserted here is more efficient and manageable for at least the following reasons:

    a. The liability claims presented predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Classes;

    b. Absent certification of the Classes, the Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

    c. Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    d. When the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

    e. This action presents no difficulty that would impede its management by the Court as a class action.

    f. A class action is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendants.

165. Because Plaintiff seeks relief for the entirety of the Classes, the prosecution of separate actions by individual Class Members would create a risk of

inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.

166. Bringing individual claims would overburden the courts and be an inefficient method of resolving the dispute, which is the center of this litigation.

167. Adjudications with respect to individual members of the Classes would, as a practical matter, dispose of the interest of other members of the Classes who are not parties to the adjudication and may impair or impede their ability to protect their interests. Consequently, class treatment is a superior method for adjudication of the issues.

## VIII. AGENTS AND CO-CONSPIRATORS

168. The anticompetitive and unlawful acts were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

169. Each corporate Defendant's agent operated under the authority and apparent authority of its respective principals.

170. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

171. Various persons and/or entities not named as Defendants may have participated as co-conspirators in the violations alleged and may have performed acts and made statements in furtherance of the conspiracy.

172. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

173. To the extent that subsidiaries within corporate families distributed Tires, these subsidiaries played a significant role in the conspiracy.

174. Defendants wished to ensure that the prices paid for Tires would not undercut their pricing agreements.

175. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices.

## IX.  CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF SECTION 1 OF THE
### SHERMAN ACT (15 U.S.C. § 1) AGAINST ALL DEFENDANTS
### (DECLARATORY AND EQUITABLE RELIEF)

176. Plaintiff incorporates each allegation in the preceding paragraphs.

177. The relevant market is the Tires market and the relevant geographic market is the United States.

178. Defendants have possessed and continue to hold at least a 65% market share in the Tires market in the United States.

179. Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of new replacement tires for passenger cars, vans, trucks, buses, and motorcycles sold within the United States for the purpose and effect of raising prices.

180.    Defendants' agreements are transactions in interstate commerce, as are the Tires themselves, which are delivered using and themselves constitute instrumentalities of interstate commerce.

181.    Defendants' agreements are together and individually per se violations of Section 1 of the Sherman Act.

182.    This is because the primary objective of the agreements is to force prices in the Tires market to increase, maintain, or stabilize at levels above what would have occurred in a competitive market.

183.    Defendants achieved that objective; the prices for new replacement tires have increased 21.4% in the last few years.

184.    Defendants are recidivists and continue to assert that their conduct was legitimate.

185.    The fact that the conduct alleged may have ceased at some point does not mean that Defendants will not engage in similar types of price-fixing in the future.

186.    Plaintiff and the Classes have been injured in their business or property because of Defendants' violations of Sections 1 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

187.    Plaintiff and the Classes are threatened with future injury to their business and property because of Defendants' continuing violation of Section 1 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

188. Under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiff and the Classes seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described in the preceding paragraphs violates Section 1 of the Sherman Act.

189. Plaintiff and the Classes seek and are entitled to an injunction against Defendants, preventing and restraining the alleged violations.

## COUNT II: VIOLATION OF STATE ANTITRUST STATUTES (ON BEHALF OF PLAINTIFF AND THE RESELLER CLASS)

190. Plaintiff incorporates each allegation in ¶¶ 1 through 157.

191. During the Class Period, Defendants entered into contracts, combinations, or conspiracies with one another, for the purpose and with the effect of artificially raising prices of replacement Tires.

192. The contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for Tires in the United States.

193. In formulating and carrying out this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of Tires purchased by Plaintiffs and members of the Reseller Class.

194. Defendants engaged in the actions described above to carry out their unlawful agreements to fix, increase, maintain, or stabilize prices of Tires.

195.    As a direct and proximate result, Plaintiff and members of the Reseller Class were deprived of free and open competition, and paid more for Tires than they otherwise would have without Defendants' unlawful conduct.

196.    This injury is of the type the antitrust laws of the states included here were designed to prevent, and this injury flows from what makes Defendants' conduct unlawful.

197.    The following Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the Reseller Class.

198.    Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same.

199.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

**Alabama**

200.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq.

201.    Defendants' combinations and conspiracy had the following effects: (a) price competition for Tires was restrained, suppressed, and eliminated throughout Alabama; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (c) Plaintiff and members of the Reseller Class were

deprived of free and open competition; and (d) Plaintiff and members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

202.    During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

203.    Because of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq.

204.    Accordingly, Plaintiff and members of the Reseller Class seek all forms of relief available under Alabama Code § 6-5-60, *et seq*.

**Arizona**

205.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq.

206.    Defendants' combination and conspiracy had the following effects: (a) price competition for Tires was restrained, suppressed, and eliminated throughout Arizona; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

207.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

208.    Defendants' violations of Arizona law were flagrant.

209.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

210.   Because of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq.

211.   Accordingly, Plaintiff and members of the Reseller Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

212.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700, et seq.

213.   During the Class Period, Defendants and their co-conspirators entered and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720.

214.   Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of Tires at supracompetitive levels.

215.   The violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Tires.

216.   To form and effectuate the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do,

including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of Tires.

217. The combination and conspiracy alleged herein has had, inter alia, the following effects: (a) price competition for Tires has been restrained, suppressed, and/or eliminated in the State of California; (b) prices for Tires provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (c) those who purchased Tires indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

218. As a direct and proximate result of Defendants' unlawful conduct, the Reseller Class have been injured in their business and property in that they paid more for Tires than they otherwise would have paid in the absence of Defendants' unlawful conduct.

219. During the Class Period, Defendants' illegal conduct substantially affected California commerce.

220. As a result of Defendants' violation of § 16720, members of the Reseller Class seek treble reseller and their cost of suit, including a reasonable attorney's fee, under California Business and Professions Code § 16750(a).

**District of Columbia**

221. Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq.

222.    Defendants' combination and conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (b) Tires prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (c) members of the Reseller Class, were deprived of free and open competition, including in the District of Columbia; and (d) members of the Reseller Class, paid supracompetitive, artificially inflated prices for Tires.

223.    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

224.    As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

225.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq.

226.    Accordingly, Plaintiff and members of the Reseller Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**Hawaii**

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, et seq.

228.    Defendants' unlawful conduct had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Hawaii; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout Hawaii; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

229. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

230. As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

231. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, et seq.

232. Accordingly, members of the Reseller Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

233. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.)

234. Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Illinois; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (c) members of the Reseller Class were deprived of a free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

235.   During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

236.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

237.   Accordingly, members of the Reseller Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

238.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq.

239.   Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Iowa; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

240.   During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

241.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

242.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq.

243.    Accordingly, members of the Reseller Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq.

245.     Defendants' combined capital, skills, or acts for the purposes of creating restrictions in trade or commerce of Tires, increasing the prices of Tires, preventing competition in the sale of Tires, or binding themselves not to sell Tires, in a manner that established the price of Tires and precluded free and unrestricted competition among themselves in the sale of Tires, in violation of Kan. Stat. Ann. § 50-101, et seq.

246.     Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Kansas; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

247.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

248.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

249.   Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq.

250.   Accordingly, members of the Reseller Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

**Maine**

251.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.)

252.   Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Maine; (b) Tires prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

253.   During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

254.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

255.    By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq.

256.    Accordingly, members of the Reseller Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Michigan**

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq.

258.    Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Michigan; (b) Tires prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (c) Plaintiff and members of the Reseller Class were deprived of free and open competition; and (4) Plaintiff and members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

259.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

260.    As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

261.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, et seq.

262.    Accordingly, Plaintiff and members of the Reseller Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

263.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq.

264.  Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Minnesota; (b) Tires prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

265.  During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

266.  As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

267.  Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq.

268.  Accordingly, members of the Reseller Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

**Mississippi**

269.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq.

270. Trusts are combinations, contracts, understandings, or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1.

271. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Mississippi; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

272. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

273. As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

274. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiff and members of the Reseller Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

**Nebraska**

275. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq.

276. Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Nebraska; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

277. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

278. As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

279. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, members of the Reseller Class seek all relief available under Nebraska Revised Statutes § 59- 801, et seq.

**Nevada**

280. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq.

281. Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout

Nevada; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

282.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

283.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

284.   Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq.

285.   Accordingly, members of the Reseller Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq.*

**New Hampshire**

286.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq.

287.   Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout New Hampshire; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

288.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

289.    As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

290.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq.

291.    Accordingly, members of the Reseller Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

**New Mexico**

292.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq.

293.    Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout New Mexico; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

294.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

295.    As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

296.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq.

297.    Accordingly, members of the Reseller Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

298.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, et seq.

299.    Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout New York; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires that were higher than they would have been absent Defendants' illegal acts.

300.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

301.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Reseller Class have been injured in their business and property and are threatened with further injury.

302.   By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, et seq.

303.   The conduct set forth above is a per se violation of the Act.

304.   Accordingly, members of the Reseller Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

305.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq.

306.   Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout North Carolina; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

307.   During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

308.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

309.   Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, et seq.

310.   Accordingly, members of the Reseller Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et seq.*

**North Dakota**

311.   Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq.

312.   Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout North Dakota; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

313.   During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

314.   As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

315. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51- 08.1-01, et seq.

316. Accordingly, members of the Reseller Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et *seq.*

**Oregon**

317. Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq.

318. Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Oregon; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

319. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

320. As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

321. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq.

322. Accordingly, Plaintiff and members of the Reseller Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

**Rhode Island**

323. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq.

324. Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Rhode Island; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

325. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

326. As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

327. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq.

328. Accordingly, members of the Reseller Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

329. Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq.

330.    Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout South Dakota; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

331.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

332.    As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

333.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

334.    Accordingly, members of the Reseller Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

335.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq.

336.    Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Tennessee; (b) Tires prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (c) members of the Reseller Class were deprived of

free and open competition; and (4) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

337.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

338.    As a direct and proximate result of Defendants' unlawful conduct, d members of the Reseller Class have been injured in their business and property and are threatened with further injury.

339.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq.

340.    Accordingly, members of the Reseller Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

341.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq.

342.    Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Utah; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

343.    During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

344.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Reseller Class have been injured in their business and property and are threatened with further injury.

345.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq.

346.    Accordingly, members of the Reseller Class seek all relief available under Utah Code Annotated § 76-10- 3101, *et seq.*

**Vermont**

347.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq.

348.    Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Vermont; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

349.    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

350.    As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

351. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq.

352. Accordingly, members of the Reseller Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

**West Virginia**

353. Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq.

354. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the West Virginia Antitrust Act.

355. Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout West Virginia; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

356. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

357. As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

358. Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq.

359.    Accordingly, members of the Reseller Class seek all relief available under West Virginia Code § 47-18-1, et seq.

**Wisconsin**

360.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq.

361.    Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably, and proximately caused injury to members of the Reseller Class.

362.    Specifically, Defendants' combination or conspiracy had the following effects: (a) Tires price competition was restrained, suppressed, and eliminated throughout Wisconsin; (b) Tires prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (c) members of the Reseller Class were deprived of free and open competition; and (d) members of the Reseller Class paid supracompetitive, artificially inflated prices for Tires.

363.    During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce.

364.    As a direct and proximate result of Defendants' unlawful conduct, members of the Reseller Class have been injured in their business and property and are threatened with further injury.

365.    Because of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq.

366.    Accordingly, Plaintiff and members of the Reseller Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

367.   Plaintiff (with respect to New York) and members of the Reseller Class in each of the above jurisdictions have been injured in their business and property because of Defendants' unlawful combination, contract, conspiracy, and agreement.

368.   Plaintiff and members of the Reseller Class have paid more for Tires than they otherwise would have paid in the absence of Defendants' unlawful conduct.

369.   This injury is of the type that the antitrust laws of the above states were designed to prevent.

370.   In addition, Defendants have profited significantly from the conspiracy.

371.   Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Reseller Class.

372.   Accordingly, members of the Reseller Class in each of the above jurisdictions seek reseller (including statutory reseller where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully asks the Court for a judgment that:

a.   Certifies the Classes under Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Classes, and declares Plaintiff as representative of the Classes;

b.   Appoints Plaintiff and its attorneys as class representative and class counsel, respectively;

c.   Enters judgment against Defendants, and in favor of Plaintiff and the Classes, holding Defendants liable for the violations alleged;

d.   Awards a declaratory judgment that Defendants restraint of trade was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects in the U.S. market for Tires

e.   Grants permanent injunctive relief:

   i.   enjoining Defendants from engaging in future anticompetitive conduct; and

   ii.   requiring Defendants to take affirmative steps to dissipate the continuing effects of its prior unlawful conduct;

f.   Awards Plaintiff and the Classes actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with law;

g.   Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

h.   Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law;

i.   Directs such further relief as it may deem just and proper.

## XI. DEMAND FOR JURY TRIAL

Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: June 21, 2024                    Respectfully submitted,

                                        */s/ Ashlie Case Sletvold*
                                        Ashlie Case Sletvold
                                        **PEIFFER WOLF CARR KANE**
                                          **CONWAY & WISE, LLP**
                                        6370 SOM Center Road, Suite 108
                                        Cleveland, Ohio 44139
                                        (216) 589-9280
                                        asletvold@peifferwolf.com

                                        */s/ Jeffery C. Zwerling*
                                        Jeffrey C. Zwerling (*pro hac vice* pending)
                                        Robin F. Zwerling (*pro hac vice* pending)
                                        **ZWERLING, SCHACHTER**
                                          **& ZWERLING, LLP**
                                        41 Madison Avenue
                                        New York, NY 10010
                                        Tel. No. (212) 223-3900
                                        jwerling@zsz.com
                                        rzwerling@zsz.com

                                        ***Attorneys for Plaintiff and the***
                                        ***Proposed Classes***